

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA          :   Honorable

        v.          **FILED**          :   Criminal No. 98-4114 (WGB)

LAWRENCE WEIL                     :   Title 18, United States
SEAN HART                            Code, Sections 371 and
JOHN ADAMS, JR.        **JUL  9 1998**   :   2, Title 15, United
NEIL WHITE                           States Code, Sections
DANIEL PETRONELLI   **AT 8:30 _____M**   78j(b) and 78ff, and
VICTOR SAMAHA       **WILLIAM T. WALSH**    Title 17, Code of Federal
MALIK TAWIL and         **CLERK**    :   Regulations, Section 240.10b-5
JOSEPH ORLANDO

I N D I C T M E N T

The Grand Jury, in and for the District of New Jersey,
sitting at Newark, charges:

COUNT 1 -- CONSPIRACY

DEFINITIONS

1.  At all times relevant to this Indictment:

a.  The OTC Bulletin Board ("OTC") and NASDAQ
securities markets were electronic markets for the securities of
companies that were not listed or traded on a securities exchange
with a trading floor, such as the New York Stock Exchange.  Many
companies whose securities were traded on the OTC and NASDAQ
markets were developing companies that had limited revenues,
earnings, and shareholders.  Many securities traded on the OTC
and NASDAQ markets were low-priced and traded on a limited basis.

The NASDAQ markets had minimum listing requirements involving assets, share price, and number of shareholders, but the OTC markets did not.

      b.  A securities brokerage firm ("brokerage firm") was a company that purchased and sold securities on behalf of the firm itself, and on behalf of the customers of the firm.

      c.  A securities broker ("broker") was an individual licensed to purchase and sell securities for customers.  A broker was a fiduciary to his customers and owed them a special duty of the utmost good faith and fair dealing.  A broker was required, among other things, to ensure that the securities he recommended were suitable for his customers in light of their financial condition and investment objectives. Moreover, in recommending the purchase of a security, a broker was required to fully and fairly disclose to his customers the material risks as well as the merits of that security.

      d.  A "boiler room" was a term in the securities business that referred to a brokerage firm that sold OTC and NASDAQ securities to customers in large volume by means of intensive, high pressure selling campaigns by numerous brokers over the telephone.

2

<u>RELEVANT ENTITY</u>

2.  At all times relevant to this Indictment, L.C.
Wegard & Co., Inc. ("Wegard") was a brokerage firm that operated
as a boiler room.  Wegard had its headquarters and a sales office
in New York, N.Y., and had branch offices in Princeton, N.J.,
Bensalem (Philadelphia), Pa., Getzville (Buffalo), N.Y.,
Monroeville (Pittsburgh), Pa., Mt. Prospect (Chicago), Ill.,
Providence, R.I., and Tarrytown, N.Y.

<u>WEGARD STOCKS</u>

3.  Every month Wegard recommended one or more OTC or
NASDAQ securities (collectively, "Wegard Stocks") to its
customers, and Wegard's brokers then sold these securities for
high sales commissions during short intensive selling periods.
The Wegard Stocks were speculative, high risk securities suitable
only for investors with a high risk tolerance because these
Stocks had the potential to drop significantly in value.  The
Wegard Stocks included but were not limited to the securities of
AFGL International, Inc., AGP & Co., Inc., Chefs International,
Inc., Concept Technologies Group, Inc., Consolidated Technology
Group Ltd. (formerly known as Sequential Information Systems,
Inc.), Diamond Entertainment Corp., First Chesapeake Financial
Corp.,  Futurebiotics, Inc., Great American Recreation, Inc.,
Immunotherapeutics, Inc., International Franchise Systems, Inc.,
Intile Designs, Inc., Lafayette Industries, Inc., Lasergate

3

Systems, Inc., Las Vegas Entertainment Network, Inc., Linkon
Corp., Luxcel Group, Inc., Nacoma Consolidated Industries, Inc.,
Non-Invasive Monitoring Systems, Inc., Officeland, Inc., PDK
Labs, Inc., Primedex Health Systems, Inc., Process Equipment,
Inc., Red Hot Concepts, Inc., Sanyo Industries, Inc., Site-Based
Media, Inc., and U.S. Transportation Systems, Inc.  The Wegard
Stocks also included one speculative, high risk security listed
on the American Stock Exchange, International Thoroughbred
Breeders, Inc.

THE DEFENDANTS

4.  At various times relevant to this Indictment:

a.  The defendant LAWRENCE WEIL was the co-branch
manager of Wegard's Bensalem, Pa. office, and a Wegard Regional
Vice President.  The defendant LAWRENCE WEIL was also a broker
who bought and sold securities for various Wegard customers.

b.  The defendant SEAN HART was the co-branch
manager of Wegard's Bensalem, Pa. office, and a Wegard Regional
Vice President.  The defendant SEAN HART was also a broker who
bought and sold securities for various Wegard customers.

c.  The defendant JOHN ADAMS, JR. was the branch
manager of Wegard's Monroeville, Pa. office, and a Wegard
Regional Vice President.  The defendant JOHN ADAMS, JR. was also
a broker who bought and sold securities for various Wegard
customers.

4

d.   The defendant NEIL WHITE was the assistant branch manager of Wegard's Monroeville, Pa. office, and a Wegard Regional Vice President.  The defendant NEIL WHITE was also a broker who bought and sold securities for various Wegard customers.

e.   The defendant DANIEL PETRONELLI was the branch manager of Wegard's Providence, R.I. office, and a Wegard Regional Vice President.  The defendant DANIEL PETRONELLI was also a broker who bought and sold securities for various Wegard customers.

f.   The defendant VICTOR SAMAHA was the assistant branch manager of Wegard's Providence, R.I. office, a manager at Wegard's Princeton, N.J. office, and a Wegard Regional Vice President.  The defendant VICTOR SAMAHA was also a broker who bought and sold securities for various Wegard customers.

g.   The defendant MALIK TAWIL was a manager in Wegard's Bensalem, Pa. and Princeton, N.J. offices, and was also a broker who bought and sold securities for various Wegard customers.

h.   The defendant JOSEPH ORLANDO was a manager in Wegard's Monroeville, Pa. office, and was also a broker who bought and sold securities for various Wegard customers.

<u>THE CONSPIRACY</u>

5.   From in or about November 1991 to in or about

5

November 1995, in the District of New Jersey and elsewhere, the
defendants

> LAWRENCE WEIL
> SEAN HART
> JOHN ADAMS, JR.
> NEIL WHITE
> DANIEL PETRONELLI
> VICTOR SAMAHA
> MALIK TAWIL
>      and
> JOSEPH ORLANDO

(hereinafter "the Defendants") and others, including Wegard's
National Sales Manager MICHAEL McDERMOTT, knowingly and willfully
combined, conspired, confederated, and agreed to employ devices,
schemes, and artifices to defraud, to make untrue statements of
material facts and omissions of material facts necessary in order
to make statements made, in the light of the circumstances under
which they were made, not misleading, and to engage in acts,
practices, and courses of business which would and did operate as
a fraud and deceit upon persons, through the use of the means and
instrumentalities of interstate commerce and of the mails, in
connection with the purchase and sale of securities, contrary to
Title 15, United States Code, Sections 78j(b) and 78ff, and Title
17, Code of Federal Regulations, Section 240.10b-5 (Securities
Exchange Act of 1934).

OVERVIEW OF THE CONSPIRACY

6.   The primary object of the conspiracy was to obtain
money and other things of value for the Defendants and their co-

6

conspirators by inducing unsuspecting investors to purchase Wegard Stocks through the use of fraudulent and deceptive sales practices. As a result of these fraudulent practices, customers who purchased the Wegard Stocks lost substantial sums of money, and the Defendants and their co-conspirators made substantial sums of money.

7. During the course of the conspiracy, the Defendants and their co-conspirators sought to achieve its object through a number of means and methods, such as those summarized below.

a. The Defendants and their co-conspirators attempted to staff Wegard offices with a sales force that could be induced to sell Wegard Stocks through fraudulent and deceptive sales practices according to the directions of the Defendants and their co-conspirators. This was accomplished by hiring primarily young individuals who had no experience in the securities business, and then giving them little or no training in the proper workings of the securities business. To complete the Wegard sales force, the Defendants and their co-conspirators hired brokers who had similar experiences at another brokerage firm that operated as a boiler room. The Defendants and their co-conspirators also staffed Wegard offices in disregard of the licensing, registration, and filing requirements mandated by securities regulators and by Wegard's compliance department.

b. The Defendants and their co-conspirators

7

instructed Wegard's brokers to sell Wegard Stocks by using fraudulent, deceptive, and high pressure sales tactics designed to induce unsuspecting investors to purchase Wegard Stocks hastily and without the opportunity to make informed and reasoned investment decisions.  In particular, the Defendants and their co-conspirators instructed Wegard's brokers to use false and misleading sales scripts that the Defendants and their co-conspirators had prepared.  These sales scripts were false and misleading because they contained factual misrepresentations about the Wegard Stocks, and omitted material facts about the Wegard Stocks that were necessary for investors to know in order to make informed and reasoned investment decisions.  Moreover, the Defendants and their co-conspirators attempted to prevent Wegard's customers from selling any Wegard Stocks that the customers had purchased because the Defendants and their co-conspirators believed that significant sales of Wegard Stocks would cause the prices of those Wegard Stocks to drop and would preclude Wegard's brokers from touting any past successes of Wegard Stocks when they solicited customers to buy new Wegard Stocks.  In fact, the Defendants and their co-conspirators at various times even refused to accept or execute customer sell orders for Wegard Stocks.

    c.  During the course of the conspiracy, the Defendants and their co-conspirators attempted to cover-up and

8

conceal their fraudulent and deceptive sales practices from securities regulators and from Wegard's own compliance department so that they could continue those practices. For example, the Defendants and their co-conspirators destroyed and concealed sales scripts; they lied to regulators and to Wegard's compliance department; and they falsified documents such as customer new account forms.

MEANS OF THE CONSPIRACY

A. The Staffing and Training at Wegard's Offices

8. The goal of the Defendants and their co-conspirators in staffing Wegard's offices and training Wegard's brokers was to create a sales force that would sell Wegard Stocks through fraudulent and deceptive sales practices according to the directions of the Defendants and their co-conspirators.

9. To achieve their goal, the Defendants and their co-conspirators recruited and hired as Wegard brokers recent college graduates with no experience in the securities business. They also hired brokers who were familiar with boiler room sales tactics as a result of having been previously employed at Hibbard Brown & Co., Inc. ("Hibbard Brown"), a brokerage firm that also operated as a boiler room.

10. In order to ensure that Wegard's young brokers would sell Wegard Stocks exactly as directed and without questioning the manner in which these securities were sold, the

9

Defendants and their co-conspirators advised and trained them as follows:

a. The Defendants and their co-conspirators purposely failed to train Wegard's young brokers in a manner that would enable them to determine a customer's suitability to purchase Wegard Stocks in light of that customer's financial means and investment objectives. Customer suitability should have been an important matter at Wegard because Wegard Stocks were speculative, high risk securities and because many Wegard customers were inexperienced and unsophisticated investors with limited financial resources.

b. The Defendants and their co-conspirators directed Wegard's young brokers to use high pressure boiler room sales tactics to sell Wegard Stocks -- often berating brokers who did not do so in front of the other brokers. The Defendants and their co-conspirators also discouraged Wegard's young brokers from asking questions about the Wegard Stocks, from reviewing prospectuses and corporate filings, and from conducting independent research before attempting to sell these securities to their customers.

c. In order to deceive Wegard's customers into believing that their Wegard brokers were more experienced than they actually were and thus knew what they were doing, some of the Defendants and their co-conspirators instructed Wegard's

young brokers to misrepresent to potential customers their level of experience in the securities business and expertise in the OTC and NASDAQ markets.

11.    The Defendants and their co-conspirators also conducted business without regard to the licensing and filing requirements mandated by securities regulators and by Wegard's compliance department.  For example, some of the Defendants and their co-conspirators solicited customers in violation of state securities laws regarding the registration of brokers.  In order to ensure that as many potential customers as possible were solicited to purchase Wegard Stocks, these Defendants and their co-conspirators solicited customers who resided in states in which they were not yet licensed, and they encouraged Wegard's young brokers to do the same.  Thereafter, if a Wegard broker actually sold a Wegard Stock to a customer in a state in which the broker was not yet licensed, the Wegard order ticket, confirmation, customer new account form, and monthly statement falsely listed the name of some Wegard broker who was licensed in that state as being the broker who had actually sold the Wegard Stock to the customer.

B.    Wegard's Fraudulent Sales Practices

12.    The primary goal of the Defendants and their co-conspirators was to sell as many shares of the Wegard Stocks as possible through the use of fraudulent and deceptive sales

practices.   To achieve this goal, the Defendants and their co-conspirators set-up and directed a rigid, tightly structured sales program for Wegard's brokers in which scripts were the primary tool utilized to lure potential customers into purchasing Wegard Stocks.

13.   The sales program consisted of three phases, each of which was closely monitored and controlled by the Defendants and their co-conspirators, and each of which involved an increasing level of sales pressure.   Wegard's sales program was typically repeated in monthly cycles and consisted of the following phases:   (a) an initial "prospecting call", in which corporate and college telephone directories were used to cold-call as many potential customers as possible; (b) a follow-up "qualifying call" to determine the maximum amount of money the customer could invest in the next Wegard Stock; and finally, (c) a high pressure "sales call" to close the sale of the Wegard Stock.

### 1.   Luring Potential Customers -- The Prospecting and Qualifying Calls

14.   The purpose of the prospecting call was to determine whether the potential customer was interested in investing in the OTC and NASDAQ markets, and if so, how much money the customer could invest.   The prospecting calls were purposely low key, and were designed by the Defendants and their co-conspirators to lure potential customers into mistakenly

believing that they were not dealing with high pressure salesmen.

15.    The Defendants and their co-conspirators provided Wegard's brokers with scripts to use during their prospecting calls.   These scripts indicated that Wegard was a full-service brokerage firm specializing in undervalued growth stocks trading on the OTC and NASDAQ markets, and that the broker did not have any specific recommendation in mind at that time, but wanted to know if the customer was interested in receiving another call if something "exciting" came along.

16.    Because corporate telephone directories were an essential tool for cold-calling potential customers, some of the Defendants and their co-conspirators instructed Wegard's brokers to obtain corporate directories any way they could, and advised the brokers that they had previously stolen such directories.

17.    The sales pressure was deliberately turned up a notch during the qualifying call, the purpose of which was to line-up potential customers for the upcoming sale of the next Wegard Stock and to determine the maximum amount of money the customers could invest in that Wegard Stock.   During the qualifying call, Wegard's brokers again utilized scripts provided to them by the Defendants and their co-conspirators.

18.    Wegard's brokers were instructed by the Defendants and their co-conspirators to ask potential customers during the qualifying call if they could invest up to $10,000 or $20,000,

13

even though at that time the broker was unaware of the name of the Wegard Stock, and usually did not know any details about the customers' financial condition, such as the customers' net worth and annual income.  Indeed, the Defendants and their co-conspirators instituted a system at Wegard whereby a Wegard broker learned details about his customer's financial condition only after the initial sale of securities to the customer when the broker was filling out the customer's new account form.

### 2.   Selling Wegard Stocks -- The Sales Phase

19.   The purpose of the sales phase of Wegard's sales program was to sell as many shares as possible of the Wegard Stocks to as many investors as possible.  To ensure that such sales occurred, sales scripts emphasizing the "can't miss" nature of the Wegard Stocks were utilized, and extremely high pressure and fraudulent sales tactics were employed.

20.   To begin the sales phase, at least once a month Wegard's National Sales Manager MICHAEL McDERMOTT usually made telephone conference calls from Wegard's Princeton, N.J. office to the managers and brokers at each Wegard office, and also held a sales meeting at the Princeton office, to discuss the current Wegard Stock.  During these conference calls and meetings, in what were essentially motivational speeches, MICHAEL McDERMOTT provided only positive information concerning the Wegard Stocks, and also often emphasized to the brokers the commission that

14

would be paid for selling the Wegard Stocks, a commission that was always considerably higher than the commission for selling other securities.  At the end of these conference calls, each Wegard office held its own sales meeting, usually led by the branch and assistant branch managers, and immediately thereafter the selling period for the Wegard Stocks began.

21.  Beginning in or about October 1993, Wegard's research and compliance departments provided the Defendants and their co-conspirators with "Model Sales Presentations" -- scripted presentations for Wegard's brokers to use when selling Wegard Stocks.  The "Model Sales Presentations" were balanced presentations that included a discussion of both the risks and merits of the Wegard Stocks, a summary of the recent financial performances of the Wegard Stocks, and the current buy and sell prices of the Wegard Stocks.  They concluded by asking whether there was any other information that the broker could provide to the customer concerning the Wegard Stocks.

22.  Wegard's compliance director specifically instructed some of the Defendants and their co-conspirators on various occasions that the "Model Sales Presentations" were the only presentations authorized by Wegard to be used by Wegard's brokers when selling Wegard Stocks.  Nevertheless, these Defendants and their co-conspirators often failed to provide the "Model Sales Presentations" to Wegard's brokers.  Moreover, even

15

when these Defendants and their co-conspirators did provide Wegard's brokers with the "Model Sales Presentations", they strongly encouraged them to use the unauthorized sales scripts discussed below, rather than the "Model Sales Presentations".

23.   The primary tools utilized by the Defendants and their co-conspirators to sell Wegard Stocks were false and misleading sales scripts (the "Sales Scripts") that they prepared and provided to Wegard's brokers.   The Defendants and their co-conspirators purposely designed these Sales Scripts so that the Sales Scripts provided only positive information concerning the Wegard Stocks, and omitted risk factors that were necessary for potential investors to know in order to make reasoned and informed investment decisions, and that may have discouraged the investors from buying the Wegard Stocks.

24.   None of the Sales Scripts disclosed the speculative, high risk nature of the Wegard Stocks, and almost all of the Sales Scripts did not disclose other material risk factors concerning the Wegard Stocks, such as the following information:

> a.   Many of the Wegard Stocks had a history of significant operating losses, had limited revenues, had substantial indebtedness, or needed additional funds to continue operations beyond a limited time period.
>
> b.   Some of the Wegard Stocks were under investigation by securities regulators, and in one instance, the offices of a company had been searched by law enforcement authorities.

16

c.   The various Great American Recreation, Inc.
and Primedex Health Systems, Inc. bonds being
recommended were subordinate in right of payment
to virtually all other debt of the companies, and
the companies had substantial indebtedness.

d.   In most instances, Wegard owned the Wegard
Stocks being recommended, and thus had a financial
incentive to tout the Wegard Stocks.

25.   The Sales Scripts also contained half-truths about

the Wegard Stocks -- statements that were literally true, but

were misleading because they did not present a complete and

balanced picture -- such as the following statements:

a.   Many of the Sales Scripts included positive
financial information concerning the Wegard
Stocks, but omitted corresponding negative
financial information.

b.   Some of the Sales Scripts touted the fact that
certain previously recommended Wegard Stocks had
gone up in price, but did not also disclose
Wegard's no sell policy, which is discussed below,
or that the prices of these Wegard Stocks had then
dropped significantly, or that almost all
previously recommended Wegard Stocks had
ultimately fallen in price.

26.   Many of the Sales Scripts included false

statements of material facts concerning the Wegard Stocks,

including the following:

a.   Some of the Sales Scripts included price
predictions and revenue estimates concerning
Wegard Stocks that were supposedly made by
Wegard's research analysts, when in fact they had
not made such predictions and estimates.

b.   Some of the Sales Scripts stated that only
preferred Wegard clients were being advised of the
Wegard Stock, when in fact the Wegard Stock was

17

being offered to virtually anyone who had the money to purchase it.

c.   Some of the Sales Scripts stated that the Wegard broker himself had researched the Wegard Stock, even though the broker had not done so, and even though Wegard's brokers were strongly discouraged from conducting independent research on Wegard Stocks.

d.   Some of the Sales Scripts stated that the Wegard broker was selling shares of the Wegard Stock in large blocks, when in fact Wegard's brokers would sell even a small number of shares.

e.   Some of the Sales Scripts stated that the Wegard Stock would soon be listed on NASDAQ, when in fact only an application had been filed, with no guarantee of listing.

27.   At various times, some of the Defendants and their co-conspirators deliberately failed to provide Wegard's brokers with important memos from Wegard's compliance and research departments that discussed some of the risk factors associated with various Wegard Stocks, and that indicated that Wegard's customers must be advised of these risks.   Moreover, these Defendants and their co-conspirators deliberately failed to even advise Wegard's brokers about the contents of the memos.   For example, in April, June, and July 1993, Wegard's brokers were not provided with "Blue Sky" memos from Wegard's compliance department, or advised of the contents of the memos.   These memos indicated that, when soliciting customers to purchase Nacoma Consolidated Industries, Inc. and Sanyo Industries, Inc. securities, the customers had to be advised of pending Securities

18

and Exchange Commission investigations concerning these companies and their securities.

28.  Wegard's brokers were instructed by the Defendants and their co-conspirators to advise potential customers during the sales call that the Wegard Stocks had to be purchased at that time because a price increase was imminent, or because there was a limited supply of the Wegard Stocks, all with the goal of having customers buy the Wegard Stocks hastily and without making informed and reasoned investment decisions.  The Defendants and their co-conspirators advised Wegard's brokers to be so persistent during the sales calls that each potential customer either bought from them or hung-up on them.

29.  During public offerings of securities, brokers were required by the securities laws to send potential investors prospectuses -- risk disclosure documents designed to assist the potential investors in deciding whether or not to purchase the securities.  When Wegard recommended that securities be purchased during public offerings of securities, the Defendants and their co-conspirators at various times failed to ensure that customers were sent preliminary prospectuses prior to their purchases, as required by the securities laws.  Moreover, the Defendants and their co-conspirators advised Wegard's brokers to discourage customers from relying on any prospectuses the customers did receive, specifically instructing the brokers to tell the

customers, for example, that the prospectuses were written by lawyers for lawyers or should be read in a dark room.

30.  Wegard's brokers were trained by the Defendants and their co-conspirators to overcome customer objections to buying the Wegard Stocks by using scripted responses to almost every conceivable customer objection, such as wanting to consult with one's wife or requesting written information on a Wegard Stock.  Moreover, Wegard's brokers were trained by the Defendants and their co-conspirators to close their high pressure sales calls and induce customers to buy the Wegard Stocks by using scripted "closes" -- catchy phrases that described the investments as simply too good to pass by.

31.  In order to increase the sales volume of the Wegard Stocks, and in order to receive additional commissions, on many occasions some of the Defendants and their co-conspirators executed unauthorized securities purchases in customer accounts. In many cases, when a customer objected to the unauthorized purchase, the Wegard broker convinced the customer to ratify the purchase by claiming that the customer was obligated to pay for it, or that the securities were already up in price, or that the purchase was in the customer's best interest.

32.  The Defendants and their co-conspirators also made misrepresentations to existing Wegard customers whose brokers had left Wegard.  In order to convince these customers to invest

20

money in additional Wegard Stocks even though their current
holdings had lost significant value, the Defendants and their co-
conspirators often told the customers that their former Wegard
broker was inexperienced, had been fired, had not made suitable
investments for them, or had recommended the Wegard Stocks at too
high a price, but that they, on the other hand, were much more
experienced and would straighten out the customers' accounts.
These statements were made even though the customers' earlier
investments in Wegard Stocks had been made at Wegard's
recommendation, and even though the Defendants and their co-
conspirators had also previously recommended these Wegard Stocks,
at the same prices paid by these customers.

### 3.   Wegard's No Sell Policy

33.   The Defendants and their co-conspirators tried to
discourage and prevent Wegard's customers from selling Wegard
Stocks because the Defendants and their co-conspirators believed
that any significant sales of the lightly traded Wegard Stocks
would cause the prices of those securities to drop and would thus
preclude Wegard's brokers from touting any past successes of
Wegard Stocks when they solicited customers to buy newly
recommended Wegard Stocks.

34.   The Defendants and their co-conspirators
instituted a policy at Wegard whereby customers were almost never
advised or solicited by their brokers to sell their Wegard

21

Stocks, except during "blowouts" as described below, and whereby Wegard's brokers strongly resisted any unsolicited attempts by their customers to sell Wegard Stocks, whether the securities were up or down in price.  The Defendants and their co-conspirators not only failed to disclose this no sell policy to Wegard's customers when they were initially attempting to sell them Wegard Stocks, but also often told customers that they would be in and out of the investments quickly, with a large profit.

35.  In many instances some of the Defendants and their co-conspirators even failed or refused to sell Wegard Stocks, although specifically instructed to do so by their customers. Moreover, at various times some of the Defendants and their co-conspirators initially refused to process the customer sell order tickets of Wegard's brokers for Wegard Stocks, and told the brokers to call the customers back and convince them not to sell the securities.

36.  In order to provide Wegard customers with a false sense of security concerning their Wegard Stocks, the Defendants and their co-conspirators participated in and caused Wegard's brokers to participate in "blowouts".  "Blowouts" were sales periods in which customers were induced to sell a designated Wegard Stock, at a slight profit shortly after the purchase, and simultaneously to reinvest the proceeds plus additional funds into a new Wegard Stock.  In virtually every instance following a

"blowout", the new Wegard Stock eventually dropped significantly in value after the purchases by Wegard customers.

### C.   The Concealment & Cover-up at Wegard

37.   Throughout the course of the conspiracy, the Defendants and their co-conspirators attempted to conceal and cover-up their fraudulent sales activities from securities regulators and from Wegard's compliance department so that they could continue their fraudulent sales activities and thus continue to make substantial amounts of money.  The securities regulators from whom the Defendants and their co-conspirators sought to conceal their fraudulent sales activities were the National Association of Securities Dealers, Inc. ("NASD"), a self-regulatory organization in the securities business, the Securities and Exchange Commission ("SEC"), a federal agency empowered to enforce the federal securities laws, and state securities regulators from New Jersey, Connecticut, Illinois, Pennsylvania, and Rhode Island.  Some of the acts taken by the Defendants and their co-conspirators to cover-up and conceal their fraudulent sales practices are described below.

38.   Securities regulators and Wegard's compliance department visited Wegard offices with some frequency to conduct compliance examinations.  In anticipation of these compliance examinations, the Defendants and their co-conspirators collected and destroyed or hid Sales Scripts and other scripts to prevent

securities regulators and Wegard's compliance department from
finding them.

39.    Securities regulators periodically issued
subpoenas and written requests to Wegard and to some of the
Defendants and their co-conspirators for the production of Sales
Scripts and other scripts.   Wegard's compliance department,
President, and General Counsel also issued written requests to
some of the Defendants and their co-conspirators for Sales
Scripts and other scripts.   In response, these Defendants and
their co-conspirators deliberately failed to produce any Sales
Scripts or other scripts.

40.    Securities regulators and Wegard's compliance
department periodically questioned some of the Defendants and
their co-conspirators about Wegard's sales practices, including
the use of Sales Scripts, during sworn testimony and interviews.
In response, these Defendants and their co-conspirators often
lied to them, denying that Sales Scripts were even used at
Wegard.

41.    The Defendants and their co-conspirators often
falsified documents such as customer new account forms and
questionnaires from Wegard's compliance department so that
Wegard's compliance department would not suspect that fraudulent
sales practices were occurring.   For example, the new account
forms falsely stated that the customers' investment objectives

included "Speculation", and the questionnaires falsely indicated
that Wegard's sales practices were carried out in accordance with
the policies of Wegard's compliance department.

## OVERT ACTS

In furtherance of this conspiracy and to effect the objects thereof, the following overt acts were committed in the District of New Jersey and elsewhere:

1.   On or about April 27, 1992, at Wegard's Monroeville, Pa. office, the defendant NEIL WHITE made an unauthorized purchase of PDK Labs, Inc. securities, and prepared a new account form that contained false and misleading information, for a customer from Clarksboro, N.J.

2.   On or about September 17, 1992, and September 24, 1992, at Wegard's Princeton, N.J. office, the defendant VICTOR SAMAHA made unauthorized purchases of Great American Recreation, Inc. and Diamond Entertainment Corp. securities for a customer from Mt. Laurel, N.J.

3.   On or about October 21, 1992, the defendant JOHN ADAMS, JR. made a telephone call to customers from Freeport, Pa., convinced the customers to purchase Great American Recreation, Inc. "Payment-in-Kind" bonds, and prepared a new account form for those customers that contained false and misleading information.

4. On or about November 18, 1992, the defendant JOSEPH ORLANDO made a telephone call to a customer from Mont Claire, Pa., convinced the customer to purchase Sanyo Industries, Inc. securities, and prepared a new account form for that customer which contained false and misleading information.

26

5.  In or about 1992, 1993, 1994, and 1995, the defendant JOHN ADAMS, JR. permitted the use, by Wegard's Monroeville, Pa. office brokers, of Sales Scripts that had been faxed from Wegard's Princeton, N.J. office.

6.  On or about January 4, 1993, at Wegard's Monroeville, Pa. office, the defendant JOHN ADAMS, JR. was interviewed by investigators from the Pennsylvania Securities Commission, and denied that Wegard's Monroeville brokers used scripts.

7.  On or about January 4, 1993, at Wegard's Monroeville, Pa. office, the defendant JOHN ADAMS, JR. denied a request by investigators from the Pennsylvania Securities Commission for a tour of the sales floor where the brokers were located, indicating that it would be disruptive to business.

8.  On or about January 6, 1993, the defendant LAWRENCE WEIL was interviewed by NASD investigators at Wegard's Bensalem, Pa. office, and denied that Wegard's Bensalem brokers had used scripts to solicit customers during the previous year.

9.  On or about January 11, 1993, the defendant JOHN ADAMS, JR. was interviewed by NASD investigators at Wegard's Monroeville, Pa. office, and denied that Wegard's Monroeville brokers had used scripts to solicit customers during the previous year.

27

10.  On or about January 26, 1993, at Wegard's Monroeville, Pa. office, the defendant NEIL WHITE signed a false and misleading new account form indicating that he was the broker of a Wegard customer from Pickford, Michigan, even though the defendant NEIL WHITE was not that customer's broker.

11.  On or about February 19, 1993, at Wegard's Providence, R.I. office, the defendant VICTOR SAMAHA signed a false and misleading new account form indicating that he was the broker of a Wegard customer from Westwood, N.J., even though the defendant VICTOR SAMAHA was not that customer's broker.

12.  On or about March 17, 1993, at Wegard's Monroeville, Pa. office, the defendant NEIL WHITE and a Monroeville broker met with a husband and wife from Turtle Creek, Pa., and discussed the couple's financial situation, their investment needs and objectives, and the opening of a Wegard account for them.

13.  In or about late March 1993, the defendant DANIEL PETRONELLI told a broker in Wegard's Providence, R.I. office to make-up a customer's age and annual income on that customer's new account form because the broker had forgotten to obtain this information from the customer.

14.  On or about March 23, 1993, the defendant DANIEL PETRONELLI held a meeting with the brokers in Wegard's Providence, R.I. office, at which the defendant VICTOR SAMAHA was

28

present.  The defendant DANIEL PETRONELLI advised the brokers that regulators were present, that they should clean-off their desks, and that their Sales Scripts and other scripts would be collected.

15.  On or about March 23, 1993, the defendant DANIEL PETRONELLI was interviewed by securities regulators from the NASD and Rhode Island at Wegard's Providence, R.I. office, and denied that Wegard's Providence brokers had used scripts to solicit customers during the previous year.

16.  On or about March 24, 1993, the defendants DANIEL PETRONELLI and VICTOR SAMAHA met with Wegard's compliance director at Wegard's Providence, R.I. office, and denied that they had any Sales Scripts or other scripts.

17.  On or about April 27, 1993, the defendant SEAN HART made a telephone call to a customer from Paramus, N.J., and convinced the customer to purchase Nacoma Consolidated Industries, Inc. securities.

18.  On or about May 28, 1993, the defendant LAWRENCE WEIL made a telephone call to a customer from Holliston, Mass. and recommended that the customer purchase Primedex Health Systems, Inc. securities.

19.  In or about late June 1993, the defendant NEIL WHITE and one of his co-conspirators told Wegard's Monroeville,

Pa. brokers to put all of their Sales Scripts and other scripts into a garbage bag.

20.   In or about July 1993, the defendant LAWRENCE WEIL collected Sales Scripts and other scripts from the brokers at Wegard's Bensalem, Pa. office.

21.   In or about early July 1993, the defendants SEAN HART, JOHN ADAMS, JR., and DANIEL PETRONELLI failed to produce any Sales Scripts or other scripts in response to a memo from Wegard's President that requested that Sales Scripts and other scripts, as well as various other documents, be sent to him.

22.   On or about July 22, 1993, the defendant JOHN ADAMS, JR. made a telephone call to a customer from Pittsburgh, Pa., and convinced the customer to sell a mutual fund he owned and use the proceeds to purchase Chefs International, Inc. securities for the customer's IRA account.

23.   On or about July 26, 1993, the defendant JOHN ADAMS, JR. made a telephone call to a customer from Monroeville, Pa., and convinced the customer to purchase Immunotherapeutics, Inc. securities.

24.   On or about July 27, 1993, the defendant JOHN ADAMS, JR. made a telephone call to a customer from Pittsburgh, Pa., convinced the customer to purchase Immunotherapeutics, Inc. securities, and prepared a new account form for that customer that contained false and misleading information.

30

25.  On or about August 23, 1993, the defendant JOSEPH ORLANDO made a telephone call to a customer from Beaver Creek, Ohio, convinced the customer to purchase U.S. Transportation Systems, Inc. securities, and prepared a new account form for that customer that contained false and misleading information.

26.  In or about late August 1993, at Wegard's Providence, R.I. office, the defendant VICTOR SAMAHA explained to one of the Providence brokers how to take-over the customer accounts of a broker who had just left Wegard.

27.  In or about September 1993, at Wegard's Providence, R.I. office, the defendant DANIEL PETRONELLI told a Providence broker that he would not sign and process several Wegard customer sell order tickets for U.S. Transportation Systems, Inc. securities that the broker had submitted to him.

28.  On or about September 27, 1993, the defendant JOSEPH ORLANDO made a telephone call to a customer from Pittsburgh, Pa., and convinced the customer to purchase almost $50,000 worth of U.S. Transportation Systems, Inc. securities.

29.  On or about September 28, 1993, the defendant NEIL WHITE made a telephone call to a customer from Turtle Creek, Pa., and convinced the customer to purchase U.S. Transportation Systems, Inc. securities.

31

30.  On or about October 7, 1993, the defendant NEIL WHITE made an unauthorized sale of Aim Constellation Fund securities for a customer from Turtle Creek, Pa.

31. In or about the Fall of 1993, the defendant VICTOR SAMAHA periodically collected Sales Scripts from the brokers in Wegard's Providence, R.I. office.

32.  On or about November 16, 1993, at Wegard's Monroeville, Pa. office, the defendant NEIL WHITE and one of his co-conspirators received a fax of a Consolidated Technology Group Ltd. Sales Script sent from Wegard's Princeton, N.J. office, and distributed the Sales Script to the brokers in Wegard's Monroeville office.

33.  On or about November 30, 1993, at Wegard's Providence, R.I. office, the defendant DANIEL PETRONELLI advised Connecticut securities regulators that the Providence brokers did not use sales scripts, and therefore, he could not provide the investigators with any such scripts.

34.  In or about December 1993, during a telephone call with a customer from Pittsburgh, Pa., the defendant JOSEPH ORLANDO refused the customer's request to sell the customer's U.S. Transportation Systems, Inc. securities.

35.  On or about December 15, 1993, at Wegard's Providence, R.I. office, the defendant DANIEL PETRONELLI signed a false and misleading new account form indicating that he was the

broker of a Wegard customer from Lexington, S.C., even though the defendant DANIEL PETRONELLI was not that customer's broker.

36. On or about January 24, 1994, at Wegard's Bensalem, Pa. office, the defendants LAWRENCE WEIL and SEAN HART received a fax of a Chefs International, Inc. Sales Script sent from Wegard's Princeton, N.J. office, and distributed the Sales Script to the brokers in Wegard's Bensalem office.

37. On or about January 24, 1994, the defendant MALIK TAWIL made a telephone call to a customer from Cleveland Heights, Ohio, convinced the customer to purchase Consolidated Technology Group Ltd. securities, and prepared a new account form for that customer that contained false and misleading information.

38. On or about February 17, 1994, the defendant MALIK TAWIL made an unauthorized purchase of Sanyo Industries, Inc. securities for a customer from Colorado Springs, Colorado.

39. In or about mid-April 1994, the defendants SEAN HART and JOHN ADAMS, JR. signed memos to Wegard's General Counsel in which they stated that they had reviewed their files, had made inquiries to the brokers in their Wegard offices, and had found no unauthorized and unapproved written sales materials.

40. In or about mid-April 1994, the defendant DANIEL PETRONELLI signed a memo to Wegard's General Counsel in which he stated that he was enclosing unapproved and unauthorized written sales materials that he had found as a result of a review of his

files and a request made to the brokers in Wegard's Providence, R.I. office. Along with the signed memo, the defendant DANIEL PETRONELLI produced certain sales materials, including a prospecting script and a qualifying script, but he failed to produce any Sales Scripts or any "closes".

41. On or about July 5, 1994, the defendant NEIL WHITE and one of his co-conspirators held a meeting with the brokers at Wegard's Monroeville, Pa. office. During the meeting, the brokers were told to put their Sales Scripts and other scripts into a garbage can placed in the middle of the sales floor, and to put their corporate and college telephone directories in their desk drawers.

42. On or about July 5, 1994, at Wegard's Monroeville, Pa. office, the defendant NEIL WHITE passed out a Wegard "Model Sales Presentation" to the brokers in the office and told them to keep it.

43. On or about July 6, 1994, at Wegard's Monroeville, Pa. office, the defendants JOHN ADAMS, JR. and NEIL WHITE, along with one of their co-conspirators, met with Wegard's compliance director and discussed, among other things, the training, supervision, and sales practices at the Monroeville office.

44. On or about August 24, 1994, when a broker at Wegard's Monroeville, Pa. office submitted a sell order ticket for a customer who owned Lafayette Industries, Inc. securities,

the defendant NEIL WHITE and one of his co-conspirators told the broker that they would not process the ticket, and belittled the broker for trying to sell the securities.

45. In or about August 1994, the defendants LAWRENCE WEIL and SEAN HART made a telephone call to a former broker at Wegard's Bensalem, Pa. office, and discussed Wegard materials that the broker still had in his possession, including scripts and the broker's customer book.

46. In or about August 1994, the defendant JOSEPH ORLANDO made a telephone call to a Wegard customer from Medford, N.J., and advised the customer that he was a manager and was taking over the customer's account, that the customer's former Wegard broker had been fired as a result of the broker's dealings with his customers, and that he was more experienced and could better service the account.

47. In or about late 1994, during a telephone call with a customer from Tinton Falls, N.J., the defendant JOHN ADAMS, JR. convinced the customer not to sell his U.S. Transportation Systems, Inc. securities.

48. On or about December 20, 1994, the defendant JOHN ADAMS, JR. made a telephone call to a customer from Evans City, Pa., and convinced the customer to purchase Lasergate Systems, Inc. securities.

49.  In or about mid-January 1995, the defendant NEIL
WHITE advised a broker at Wegard's Monroeville, Pa. office not to
sell Lasergate Systems, Inc. securities to the broker's father.

50.  In or about early 1995, the defendant VICTOR
SAMAHA told one of the brokers in Wegard's Providence, R.I.
office to "get as much as you can as quick as you can" from the
broker's Wegard customers.

51.  In or about early 1995, at Wegard's Providence,
R.I. office, the defendant VICTOR SAMAHA saw an old Sales Script
on the desk of one of the Providence brokers, and told the broker
that the Sales Script should not be there.  Thereafter, one of
the senior Providence brokers collected old Sales Scripts from
the Providence brokers.

52.  On or about February 21, 1995, the defendant
LAWRENCE WEIL made an unauthorized purchase of Futurebiotics,
Inc. securities for a customer from Rockville, Maryland.

53.  On or about February 23, 1995, the defendant
LAWRENCE WEIL made an unauthorized purchase of AFGL
International, Inc. securities for a customer from Wilmington,
Del.

54.  In or about mid-March 1995, the defendants DANIEL
PETRONELLI and VICTOR SAMAHA held a meeting with the brokers in
Wegard's Providence, R.I. office concerning the expected visit of
Wegard's compliance department.  The defendant DANIEL PETRONELLI

told the brokers, among other things, that their Sales Scripts and other scripts would be collected and, if asked by Wegard's compliance department what they used to sell securities, to refer them to the due dilligence files in the office.

55.   On or about March 14, 1995, at Wegard's Providence, R.I. office, the defendants DANIEL PETRONELLI and VICTOR SAMAHA met with Wegard's compliance director and discussed, among other things, the training, supervision, and sales practices at the Providence office.

56.   In or about late March 1995, the defendants LAWRENCE WEIL and SEAN HART held a meeting with the brokers at Wegard's Bensalem, Pa. office, and discussed the expected visit to the office of Wegard's compliance department.  During this meeting the defendant LAWRENCE WEIL told the Bensalem brokers to throw their Sales Scripts in the trash, and to put their corporate telephone directories inside their desks.

57.   On or about March 30, 1995, at Wegard's Bensalem, Pa. office, the defendants LAWRENCE WEIL and SEAN HART met with Wegard's compliance director and his assistant and discussed, among other things, the training, supervision, and sales practices at the Bensalem office.

58.   On or about April 4, 1995, at Wegard's Princeton, N.J. office, the defendant MALIK TAWIL prepared, signed, and

dated a "BRANCH EXAMINATIONS" questionnaire from Wegard's compliance department.

59. On or about April 5, 1995, at Wegard's Princeton, N.J. office, the defendant LAWRENCE WEIL prepared, signed, and dated a "BRANCH EXAMINATIONS" questionnaire from Wegard's compliance department.

60. In or about early May 1995, the defendants JOHN ADAMS, JR. and NEIL WHITE, along with one of their co-conspirators, held a meeting with the brokers in Wegard's Monroeville, Pa. office. During this meeting the brokers were told, among other things, that corporate telephone directories were to be put away and that Sales Scripts and other scripts would be collected because of the expected visit to the office by Wegard's compliance department. Thereafter, the Sales Scripts and other scripts were collected from the Monroeville brokers by several managers, including the defendant JOSEPH ORLANDO.

61. On or about May 9, 1995, the defendant JOSEPH ORLANDO told one of the brokers in Wegard's Monroeville, Pa. office how to answer the "BRANCH EXAMINATIONS" questionnaire from Wegard's compliance department.

62. On or about May 9 and 10, 1995, at Wegard's Monroeville, Pa. office, the defendants JOHN ADAMS, JR., NEIL WHITE, and JOSEPH ORLANDO prepared, signed, and dated "BRANCH EXAMINATIONS" questionnaires from Wegard's compliance department.

38

63. On or about May 10, 1995, at Wegard's Monroeville, Pa. office, the defendant JOHN ADAMS, JR. met with Wegard's compliance director and his assistant and discussed, among other things, the training, supervision, and sales practices at the Monroeville office.

64. On or about May 26, 1995, the defendants SEAN HART, NEIL WHITE, and DANIEL PETRONELLI signed and dated memos and produced certain records to Wegard's compliance director, but failed to produce any Sales Scripts or other scripts, in connection with a request for various records, including Sales Scripts and other scripts, from the Pennsylvania Securities Commission.

65. On or about June 26, 1995, at Wegard's Providence, R.I. office, the defendants DANIEL PETRONELLI and VICTOR SAMAHA received a fax of a Las Vegas Entertainment Network, Inc. Sales Script sent from Wegard's Princeton, N.J. office, and distributed the Sales Script to the brokers in the Providence office.

66. In or about the late Summer and Fall of 1995, the defendant LAWRENCE WEIL, with the knowledge of the defendant SEAN HART, continued to lead sales meetings in Wegard's Bensalem, Pa. office, to act in a supervisory capacity, and to run the office, even though he was precluded from doing so by Wegard's compliance department.

67.  On or about August 14, 1995, the defendant MALIK TAWIL attended meetings at Wegard's Princeton, N.J. office in which MICHAEL McDERMOTT discussed "cleaning-up" the office prior to the expected visit to the office the following day by the New Jersey Bureau of Securities.  The primary purpose of such office "clean-ups" was to prevent securities regulators and Wegard's compliance department from finding any Sales Scripts or other scripts during compliance examinations.

68.  On or about August 14, 1995, the defendant MALIK TAWIL participated in "cleaning-up" Wegard's Princeton, N.J. office, which "clean-up" involved, among other things, collecting Sales Scripts and other scripts from the brokers in the office and placing them in trash bags.

69.  On or about August 16, 1995, the defendant MALIK TAWIL picked-up one of his co-conspirators at the co-conspirator's home in Monmouth Junction, N.J., and they took the trash bags of Sales Scripts and other scripts referred to above in the defendant MALIK TAWIL's car to a dumpster behind a pizza restaurant in Kingston, N.J. where they disposed of the trash bags.

70.  In or about late September 1995, during a telephone call with a customer from Naperville, Illinois, the defendant MALIK TAWIL stated that, if the customer did not

continue to invest with him, the customer would be eating dog food in his retirement.

71.   On or about October 5, 1995, the defendant LAWRENCE WEIL prepared a fraudulent memo which falsely stated that a Drexel Hill, Pa. customer of a former Wegard broker had rescinded the closing of his Wegard account and the transfer of his securities to another brokerage firm.

72.   On or about November 1, 1995, at Wegard's Monroeville, Pa. office, the defendant JOSEPH ORLANDO made an unauthorized purchase of Intile Designs, Inc. securities for a customer from Roselle, N.J.

All in violation of Title 18, United States Code, Section 371.

41

COUNTS 2-13
## SECURITIES FRAUD, LAWRENCE WEIL and SEAN HART

1.    Paragraphs 1-3, 4a, 4b, and 6-41 of Count 1 of this
Indictment are hereby realleged and incorporated by reference as
if fully set forth herein.

2.    At or about the times set forth below, in the
District of New Jersey and elsewhere, the defendants

LAWRENCE WEIL
and
SEAN HART

knowingly and willfully employed devices, schemes, and artifices
to defraud, made untrue statements of material facts and omitted
to state material facts necessary to make statements made, in
light of the circumstances under which they were made, not
misleading, and engaged in acts, practices, and courses of
business which would and did operate as a fraud and deceit upon
persons, in connection with the purchase and sale of the
securities identified below, through the use of means and
instrumentalities of interstate commerce and of the mails, in
that the defendants LAWRENCE WEIL and SEAN HART disseminated and
caused to be used by Wegard brokers Sales Scripts that omitted
material facts.

42

| COUNT | WEGARD STOCK | APPROXIMATE TIME PERIOD |
|---|---|---|
| 2 | Immunotherapeutics, Inc. | Late July 1993 |
| 3 | Consolidated Technology Group Ltd. | Mid-Late November 1993 |
| 4 | Immunotherapeutics, Inc. | Mid-Late January 1994 |
| 5 | Consolidated Technology Group Ltd. | Mid-Late July 1994 |
| 6 | Chefs International, Inc. | Mid-Late November 1994 |
| 7 | Lasergate Systems, Inc. | Mid-Late December 1994 |
| 8 | Futurebiotics, Inc. | Mid-Late March 1995 |
| 9 | International Thoroughbred Breeders, Inc. | Mid-Late May 1995 |
| 10 | Las Vegas Entertainment Network, Inc. | Late June - Early July 1995 |
| 11 | Concept Technologies Group, Inc. | Late June - Early July 1995 |
| 12 | Intile Designs, Inc. | Late August 1995 |
| 13 | Red Hot Concepts, Inc. | Mid-Late September 1995 |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

43

COUNT 14
SECURITIES FRAUD, LAWRENCE WEIL and SEAN HART

1.   Paragraphs 1-3, 4a, 4b, and 6-41 of Count 1 of this
Indictment are hereby realleged and incorporated by reference as
if fully set forth herein.

2.   In or about late July 1993, in the District of New
Jersey and elsewhere, the defendants

LAWRENCE WEIL
and
SEAN HART

knowingly and willfully employed devices, schemes, and artifices
to defraud, made untrue statements of material facts and omitted
to state material facts necessary to make statements made, in
light of the circumstances under which they were made, not
misleading, and engaged in acts, practices, and courses of
business which would and did operate as a fraud and deceit upon
persons, in connection with the purchase and sale of Sanyo
Industries, Inc. ("Sanyo") securities, through the use of means
and instrumentalities of interstate commerce and of the mails, in
that they disseminated and caused to be used by Wegard's
Bensalem, Pa. office brokers a Sanyo Sales Script that included
material misrepresentations and omitted material facts, and
deliberately failed to provide Wegard's Bensalem brokers with a
memo from Wegard's compliance department, or to advise the
brokers of the contents of the memo.   The memo stated that

44

Wegard's brokers were required to advise their customers of an SEC investigation involving Sanyo when soliciting customers to purchase Sanyo securities.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

45

COUNTS 15-27
SECURITIES FRAUD, LAWRENCE WEIL

1.   Paragraphs 1-3, 4a, and 6-41 of Count 1 of this
Indictment are hereby realleged and incorporated by reference as
if fully set forth herein.

2.   On or about the dates set forth below, in the
District of New Jersey and elsewhere, the defendant

LAWRENCE WEIL

knowingly and willfully employed devices, schemes, and artifices
to defraud, made untrue statements of material facts and omitted
to state material facts necessary to make statements made, in
light of the circumstances under which they were made, not
misleading, and engaged in acts, practices, and courses of
business which would and did operate as a fraud and deceit upon
persons, in connection with the purchase and sale of the
securities identified below, through the use of means and
instrumentalities of interstate commerce and of the mails, all as
more fully described below.

| COUNT | APPROX. DATE | NATURE OF FRAUD |
|-------|--------------|-----------------|
| 15 | September 30, 1993 | Omission of material facts in connection with sale of Immunotherapeutics, Inc. securities to a customer from Bridgewater, N.J. |
| 16 | November 19, 1993 | Omission of material facts in connection with sale of Consolidated Technology Group |

46

|    |                   | Ltd. securities to a customer from Haddonfield, N.J. |
|----|-------------------|------------------------------------------------------|
| 17 | January 21, 1994  | Material misrepresentations and omission of material facts in connection with sale of Consolidated Technology Group Ltd. securities to a customer from Bridgewater, N.J. |
| 18 | January 24, 1994  | Omission of material facts in connection with sale of Immunotherapeutics, Inc. securities to a customer from Haddonfield, N.J. |
| 19 | April 15, 1994    | Unauthorized sale of Consolidated Technology Group Ltd. securities for a customer from Haddonfield, N.J. |
| 20 | April 21, 1994    | Material misrepresentations and omission of material facts in connection with sale of AFGL International, Inc. securities to a customer from Haddonfield, N.J. |
| 21 | July 19, 1994     | Unauthorized purchase of Consolidated Technology Group Ltd. securities for a customer from Bridgewater, N.J. |
| 22 | November 18, 1994 | Unauthorized purchase of Lafayette Industries, Inc. securities for a customer from Medford, N.J. |
| 23 | November 23, 1994 | Material misrepresentations and omission of material facts in connection with sale of PDK Labs, Inc. securities to a customer from Dover, N.J. |
| 24 | December 15, 1994 | Omission of material facts in connection with sale of Lasergate Systems, Inc. |

|    |                 | securities to a customer from Dover, N.J. |
|----|-----------------|-------------------------------------------|
| 25 | July 28, 1995   | Omission of material facts in connection with sale of International Franchise Systems, Inc. securities to a customer from Dover, N.J. |
| 26 | August 21, 1995 | Material misrepresentations and omission of material facts in connection with sale of Futurebiotics, Inc. securities to a customer from Florham Park, N.J. |
| 27 | October 6, 1995 | Unauthorized purchase of International Franchise Systems, Inc. securities for a customer from Old Bridge, N.J. |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

COUNTS 28-31
SECURITIES FRAUD, SEAN HART

1.    Paragraphs 1-3, 4b, and 6-41 of Count 1 of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

2.    On or about the dates set forth below, in the District of New Jersey and elsewhere, the defendant

SEAN HART

knowingly and willfully employed devices, schemes, and artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon persons, in connection with the purchase and sale of the securities identified below, through the use of means and instrumentalities of interstate commerce and of the mails, all as more fully described below.

| COUNT | APPROX. DATE | NATURE OF FRAUD |
|---|---|---|
| 28 | July 26, 1993 | Omission of material facts in connection with sale of Immunotherapeutics, Inc. securities to a customer from Wall, N.J. |
| 29 | September 30, 1993 | Omission of material facts in connection with sale of Immunotherapeutics, Inc. |

49

|    |                 | securities to a customer from Wall, N.J. |
|----|-----------------|-------------------------------------------|
| 30 | August 23, 1994 | Unauthorized purchase of Lafayette Industries, Inc. securities for a customer from Wall, N.J. |
| 31 | August 24, 1994 | Omission of material facts in connection with sale of PDK Labs, Inc. securities to a customer from Dover, N.J. |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.20b-5.

COUNTS 32-38
SECURITIES FRAUD, NEIL WHITE

1.  Paragraphs 1-3, 4d, and 6-41 of Count 1 of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

2.  At or about the times set forth below, in the District of New Jersey and elsewhere, the defendant

NEIL WHITE

and one of his co-conspirators, knowingly and willfully employed devices, schemes, and artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon persons, in connection with the purchase and sale of the securities identified below, through the use of means and instrumentalities of interstate commerce and of the mails, in that the defendant NEIL WHITE and one of his co-conspirators disseminated and caused to be used by Wegard brokers Sales Scripts that omitted material facts.

| COUNT | WEGARD STOCK | APPROXIMATE TIME PERIOD |
|-------|--------------|-------------------------|
| 32 | Diamond Entertainment Corp. | Early October 1993 |
| 33 | Immunotherapeutics, Inc. | Late September 1993 |
| 34 | Great American Recreation, Inc. | Mid-Late October 1993 |
| 35 | Consolidated Technology Group Ltd. | Mid-Late November 1993 |
| 36 | Immunotherapeutics, Inc. | Mid-Late December 1993 |
| 37 | Futurebiotics, Inc. | Mid-Late March 1995 |
| 38 | Las Vegas Entertainment Network, Inc. | Late June - Early July 1995 |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

COUNTS 39-42
SECURITIES FRAUD, NEIL WHITE

1.   Paragraphs 1-3, 4d, and 6-41 of Count 1 of this
Indictment are hereby realleged and incorporated by reference as if
fully set forth herein.

2.   On or about the dates set forth below, in the District
of New Jersey and elsewhere, the defendant

NEIL WHITE

knowingly and willfully employed devices, schemes, and artifices to
defraud, made untrue statements of material facts and omitted to
state material facts necessary to make statements made, in light of
the circumstances under which they were made, not misleading, and
engaged in acts, practices, and courses of business which would and
did operate as a fraud and deceit upon persons, in connection with
the purchase and sale of the securities identified below, through
the use of means and instrumentalities of interstate commerce and of
the mails, all as more fully described below.

| COUNT | APPROX. DATE | NATURE OF FRAUD |
|-------|--------------|-----------------|
| 39 | October 26, 1994 | Omission of material facts in connection with sale of Lafayette Industries, Inc. securities to a customer from Middletown, N.J. |
| 40 | December 16, 1994 | Material misrepresentations and omission of material facts in connection with sale of Lasergate Systems, Inc. securities to a customer from Somerset, N.J. |

53

| 41 | January 24, 1995 | Omission of material facts in connection with sale of Futurebiotics, Inc. securities to a customer from Somerset, N.J. |
| 42 | February 22, 1995 | Omission of material facts in connection with sale of Futurebiotics, Inc. securities to a customer from Middletown, N.J. |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

COUNTS 43-49
SECURITIES FRAUD, DANIEL PETRONELLI and VICTOR SAMAHA

1.   Paragraphs 1-3, 4e, 4f, and 6-41 of Count 1 of this
Indictment are hereby realleged and incorporated by reference as if
fully set forth herein.

2.   At or about the times set forth below, in the District
of New Jersey and elsewhere, the defendants

DANIEL PETRONELLI
and
VICTOR SAMAHA

knowingly and willfully employed devices, schemes, and artifices to
defraud, made untrue statements of material facts and omitted to
state material facts necessary to make statements made, in light of
the circumstances under which they were made, not misleading, and
engaged in acts, practices, and courses of business which would and
did operate as a fraud and deceit upon persons, in connection with
the purchase and sale of the securities identified below, through
the use of means and instrumentalities of interstate commerce and of
the mails, in that the defendants DANIEL PETRONELLI and VICTOR
SAMAHA disseminated and caused to be used by Wegard brokers Sales
Scripts that omitted material facts.

| COUNT | WEGARD STOCK | APPROXIMATE TIME PERIOD |
|-------|--------------|-------------------------|
| 43 | First Chesapeake Financial Corp. | Mid-July 1993 |
| 44 | Immunotherapeutics, Inc. | Late September 1993 |
| 45 | Consolidated Technology Group Ltd. | Mid-Late November 1993 |
| 46 | Immunotherapeutics, Inc. | Mid-Late December 1993 |
| 47 | Immunotherapeutics, Inc. | Mid-Late January 1994 |
| 48 | Consolidated Technology Group Ltd. | Late February 1995 |
| 49 | Futurebiotics, Inc. | Mid-Late March 1995 |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

COUNT 50
SECURITIES FRAUD, DANIEL PETRONELLI

1. Paragraphs 1-3, 4e, and 6-41 of Count 1 of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

2. In or about late July 1993, in the District of New Jersey and elsewhere, the defendant

DANIEL PETRONELLI

knowingly and willfully employed devices, schemes, and artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon persons, in connection with the purchase and sale of Sanyo Industries, Inc. ("Sanyo") securities, through the use of means and instrumentalities of interstate commerce and of the mails, in that the defendant DANIEL PETRONELLI disseminated and caused to be used by Wegard's Providence, R.I. office brokers a Sanyo Sales Script that included material misrepresentations and omitted material facts, and deliberately failed to provide Wegard's Providence brokers with a memo from Wegard's compliance department, or to advise the brokers of the contents of the memo. The memo stated that Wegard's brokers were required to advise their customers of an SEC investigation involving Sanyo when soliciting customers to purchase Sanyo securities.

57

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

COUNT 51
SECURITIES FRAUD, VICTOR SAMAHA

1.   Paragraphs 1-3, 4f, and 6-41 of Count 1 of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

2.   On or about July 15, 1993, in the District of New Jersey and elsewhere, the defendant

VICTOR SAMAHA

knowingly and willfully employed devices, schemes, and artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon persons, in connection with the purchase and sale of First Chesapeake Financial Corp. securities, through the use of means and instrumentalities of interstate commerce and of the mails, in that the defendant VICTOR SAMAHA signed and assisted in the preparation of a false and misleading new account form for a customer of another Wegard broker from Spring Lake, N.J.

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

59

COUNTS 52-60
SECURITIES FRAUD, MALIK TAWIL

1.   Paragraphs 1-3, 4g, and 6-41 of Count 1 of this Indictment are hereby realleged and incorporated by reference as if fully set forth herein.

2.   On or about the dates set forth below, in the District of New Jersey and elsewhere, the defendant

MALIK TAWIL

knowingly and willfully employed devices, schemes, and artifices to defraud, made untrue statements of material facts and omitted to state material facts necessary to make statements made, in light of the circumstances under which they were made, not misleading, and engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon persons, in connection with the purchase and sale of the securities identified below, through the use of means and instrumentalities of interstate commerce and of the mails, all as more fully described below.

| COUNT | APPROX. DATE | NATURE OF FRAUD |
|-------|--------------|-----------------|
| 52 | February 18, 1994 | Omission of material facts in connection with sale of Sanyo Industries, Inc. securities to a customer from Garwood, N.J. |
| 53 | February 18, 1994 | Omission of material facts in connection with sale of Sanyo Industries, Inc. securities to a customer from Easton, Pa., |

|    |                    | who worked in Phillipsburg, N.J. |
|----|--------------------|----------------------------------|
| 54 | March 23, 1994     | Omission of material facts in connection with sale of Primedex Health Systems, Inc. securities to a customer from Garwood, N.J. |
| 55 | April 21, 1994     | Omission of material facts in connection with sale of AFGL International, Inc. securities to a customer from Easton, Pa., who worked in Phillipsburg, N.J. |
| 56 | August 19, 1994    | Unauthorized purchase of Futurebiotics, Inc. securities for a customer from Colorado Springs, Co. |
| 57 | August 19, 1994    | Material misrepresentations and omission of material facts in connection with sale of Futurebiotics, Inc. securities to a customer from Preston, Ct. |
| 58 | September 20, 1994 | Material misrepresentations and omission of material facts in connection with sale of Futurebiotics, Inc. securities to a customer from Preston, Ct. |
| 59 | December 20, 1994  | Omission of material facts in connection with sale of Lasergate Systems, Inc. securities to a customer from Garwood, N.J. |
| 60 | April 13, 1995     | Unauthorized purchase of Consolidated Technology Group Ltd. securities for a customer from Temple, Pa. |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

COUNTS 61-68
SECURITIES FRAUD, JOSEPH ORLANDO

1.  Paragraphs 1-3, 4h, and 6-41 of Count 1 of this
Indictment are hereby realleged and incorporated by reference as
if fully set forth herein.

2.  On or about the dates set forth below, in the
District of New Jersey and elsewhere, the defendant

JOSEPH ORLANDO

knowingly and willfully employed devices, schemes, and artifices
to defraud, made untrue statements of material facts and omitted
to state material facts necessary to make statements made, in
light of the circumstances under which they were made, not
misleading, and engaged in acts, practices, and courses of
business which would and did operate as a fraud and deceit upon
persons, in connection with the purchase and sale of the
securities identified below, through the use of means and
instrumentalities of interstate commerce and of the mails, all as
more fully described below.

| COUNT | APPROX. DATE | NATURE OF FRAUD |
|---|---|---|
| 61 | October 22, 1993 | Omission of material facts in connection with sale of Great American Recreation, Inc. securities to a customer from Brick, N.J. |

63

| | | |
|---|---|---|
| 62 | November 18, 1993 | Omission of material facts in connection with sale of Consolidated Technology Group Ltd. securities to a customer from Brick, N.J. |
| 63 | December 15, 1993 | Omission of material facts in connection with sale of Immunotherapeutics, Inc. securities to customers from Chatham, N.J. |
| 64 | January 21, 1994 | Omission of material facts in connection with sale of Consolidated Technology Group Ltd. securities to a customer from Brick, N.J. |
| 65 | February 17, 1994 | Unauthorized purchase of Sanyo Industries, Inc. securities for customers from Chatham, N.J. |
| 66 | March 23, 1994 | Unauthorized purchase of Primedex Health Systems, Inc. securities for a customer from Brick, N.J. |
| 67 | September 25, 1995 | Omission of material facts in connection with sale of Intile Designs, Inc. securities to a customer from Roselle, N.J. |
| 68 | November 1, 1995 | Unauthorized purchase of Intile Designs, Inc. securities for a customer from Roselle, N.J. |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff, Title 18, United States Code, Section 2, and Title 17, Code of Federal Regulations, Section 240.10b-5.

A TRUE BILL

FAITH S. HOCHBERG
United States Attorney